IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| BART J. WINKLER and ROSE LAKE DEV., INC., <br><br>  Plaintiffs, <br><br> vs. <br><br> HENNIGAR CONSTRUCTION, LLC, ENERGENETICS LEE COUNTY CORP., and ENERGENETICS INTERNATIONAL, INC., <br><br>  Defendants. | 3:15-cv-88-JAJ-HCA <br><br><br><br><br> **REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO ENFORCE SETTLEMENT** |

Defendants Hennigar Construction, LLC ("Hennigar"), EnerGenetics Lee County Corp., and EnerGenetics International, Inc. (together "EnerGenetics") filed a Motion to Enforce Settlement. ECF No. [79]. Plaintiffs Bart Winkler ("Winkler") and Rose Lake Dev., Inc. ("Rose Lake") responded. ECF No. [83]. Defendants replied to Plaintiffs' response. ECF No. [85]. The Court held a hearing on February 8, 2017. The case is before the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The Court considers this matter fully submitted on the briefing and oral arguments of the parties.

**FACTS**

The problems among these parties began when Dublin and Michael Hennigar, the two members of Hennigar, invested in EnerGenetics, which is a collection of corporations that manufactures biofuels out of corn. As part of this endeavor, EnerGenetics owns machinery that turns corn into biofuel ("the Assets"). Dublin and Michael Hennigar became involved in EnerGenetics by investing in it, leasing space to EnerGenetics in Fort Madison, Iowa, and helping

1

operate the plant. Winkler also invested in EnerGenetics. Rose Lake is a corporation associated with Winkler. On December 19, 2012, EnerGenetics granted Hennigar a security interest in the Assets, which Winkler and Rose Lake contend was a fraudulent conveyance.

In April of 2013, Winkler filed a separate lawsuit alleging that EnerGenetics, among others, violated federal and state securities laws. Hennigar was not a party to that 2013 lawsuit. The parties settled the suit and those defendants—including EnerGenetics—still owe Winkler $970,000.

On August 6, 2015, Winkler and Rose Lake filed this lawsuit alleging that Hennigar's security interest in the Assets was a fraudulent conveyance. Winkler and Rose Lake asked the Court to void the security interest and allow Winkler and Rose Lake to execute on the Assets. In the alternative, Winkler and Rose Lake requested a judgment in their favor for the value of the Assets.

On November 22 and 23, 2016, counsel for the parties began negotiating a settlement via email.[1] The following is a summary of their negotiations.[2]

| November 22 at 3:33 PM | Defendants offered to waive all encumbrances on the Assets in exchange for a release of all claims against Hennigar. They also offered to credit the proceeds of the Assets' sale towards satisfying Winkler's judgment against EnerGenetics from the securities suit. |
|---|---|
| November 22 at 4:23 PM | Plaintiffs asked whether the Assets were still functional. |
| November 22 at 5:03 PM | Defendants responded that no one had run the Assets since 2013, and the individual who knew how to run them is deceased. |
| November 23 at 8:56 AM | Plaintiffs offered (1) EnerGenetics will transfer title of the Assets to Winkler, (2) Hennigar will release its security interest and any other interest it has in the Assets, (3) Hennigar will give Winkler a $66,400 non-interest-bearing promissory note with no payments due until the entire amount is due in two years, (4) both parties will attempt to sell the Assets, with 10% of the sale proceeds going towards the balance of the note (sale price subject to Winkler's approval), and (5) "Hennigar . . . will agree to store the assets, as is, |

---

[1] The parties agree that all relevant negotiations occurred via email and that there was no need for an evidentiary hearing because the facts relevant to the Motion to Enforce Settlement are undisputed. Hr'g Tr. at 11–12, 23, ECF No. [88].

[2] The Court added the parenthetical numbers in the table to assist in following the parties negotiations over each term. For example, language following (3) refers to the parties' negotiations over the note term.

2

| | |
|---|---|
| | in the current pilot plant space during this two year period and my client will have access to them and the plant space for the purpose of showing them to potential buyers." Def.'s Ex. A at 9, ECF No. [79-2]. |
| November 23 at 1:07 PM | Defendants: (1) agreed to the transfer of title, (2) agreed to the release of the security interest and any other interest in the Assets, (3) rejected the promissory note, and (5) counteroffered that "[t]he equipment can be stored for 6 months in the plant as is now. Access for potential buyers upon reasonable notice." Def.'s Ex. A at 8. |
| November 23 at 1:32 PM | Plaintiffs agreed on (1) the transfer of title, and (2) release of all Hennigar's claims to the Assets. Plaintiffs counter-offered with (3) a promissory note with the same terms, but for $30,000, and (5) said "My client needs 1 year in the plant as it is now (it will take some time to sell these things)." Def.'s Ex. A at 7. |
| November 23 at 1:48 PM | Defendants again agreed to (1) the transfer of the Assets, and (2) Hennigar's release of all rights to the Assets. They counter-offered with (3) "No note, no money," and (5) "10 months." They also stated that the Hennigars will insure the building, but Winkler will have to insure the Assets. Def.'s Ex. A at 6. |
| November 23 at 1:58 PM | Plaintiffs counter-offered (3) a $30,000 note, and (5) a ten-month storage term. |
| November 23 at 2:10 PM | Defendants offered (3) $10,000 note, and (5) a 12-month storage term. |
| November 23 at 2:20 PM | Plaintiffs counter-offered: (3) a $25,000 note, and (5) said "We agree to 12 months." Plaintiffs also said "To be clear, my client said that he'd like to be able to use the property in its current state if he needs to, so I was thinking something like a lease or something for 12 months that would allow my client to do that." Def.'s Ex. A at 3. |
| November 23 at 2:31 PM | Defendants responded, "Talked with my clients. These terms are just not possible for them." Def.'s Ex. A at 2. |
| November 23 at 2:44 PM | Plaintiffs responded, "My client will agree to the $10,000 note, the assets, the waiver, and the 12 months then. We have a deal." Plaintiffs' counsel offered to let the Court know of the settlement and draft the settlement documents. Def.'s Ex. A at 1–2. |
| November 23 at 2:45 PM | Defendants replied, "Yes agreed." Def.'s Ex. A at 1. |

Each of Plaintiffs' counsel's emails contained a link that said "Notice: Important disclaimers and limitations apply to this email. Please click here for our disclaimers and limitations." Def.'s Ex. A at 2. Clicking the link brought the user to a page on counsel's website, which contained a disclaimer that read, in relevant part, "Contract formation in this matter shall

3

occur only with manually-affixed original signatures on original documents unless otherwise specifically agreed in writing." Pl.'s Ex. A at 2, ECF No. [83-2].

On November 23, 2016, Plaintiff's counsel sent a letter to Chief Judge Jarvey that read, "Please be advised that the parties have agreed to settle their dispute and therefore, jointly request that the Court take the trial currently scheduled to start on Monday, November 28, 2016, off the calendar. The parties will be filing their dismissal documents in short order." Def.'s Ex. B. The Court entered an order canceling trial and for closing documents that day. ECF No. [76].

On November 29, 2016, Plaintiffs' counsel sent a draft of the settlement agreement to Defendants' counsel that included a 12-month "use" term, which gave Plaintiffs exclusive control over Hennigar's plant and allowed Plaintiffs to operate the Assets to make a profit. On December 11, 2016, Defendants' counsel returned a redlined draft that changed the use term to a 12-month storage term; it only allowed Plaintiffs access to the Assets in order to show potential purchasers. Plaintiffs' counsel objected to the removal of the use term in Defendants' proposed amendments, and the parties began disputing whether they had reached a settlement.

## DISCUSSION

In Iowa, contract law governs settlement agreements. *Phipps v. Winneshiek Cty.*, 593 N.W.2d 143, 146 (Iowa 1999). Contract formation requires that the parties mutually intend to be bound by the terms of the contract and mutually assent to enter into the contract. *Great Lakes Commc'n Corp. v. AT&T Corp.*, 124 F. Supp. 3d 824, 838 (N.D. Iowa 2015). Mutual intent to be bound by the terms of the contract is a "meeting of the minds." *See Peak v. Adams*, 799 N.W.2d 535, 544 (Iowa 2011). "To meet this standard, the contract terms must be sufficiently definite for the court to determine the duty of each party and the conditions of performance." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010) (citing *Seastrom v. Farm Bureau*

4

*Life Ins. Co.*, 601 N.W.2d 339, 346 (Iowa 1999)). When searching for mutual intent, courts "look to what the parties did and said, rather than some secret, undisclosed intention they may have had in mind or which occurred to them later." *Peak*, 799 N.W.2d at 544. Parties manifest mutual assent to enter into a contract through an offer and an acceptance. *Rick v. Sprague*, 706 N.W.2d 717, 724 (Iowa 2005).

The test for whether the parties formed a contract is objective. *Rucker v. Taylor*, 828 N.W.2d 595, 602 (Iowa 2013). The question of whether the parties formed a valid contract is a question of law. *Great Lakes Commc'n Corp.*, 124 F. Supp. 3d at 838 (internal citations omitted).

**Mutual Intent**

The undersigned finds that the parties mutually intended to be bound by the terms of their negotiations. When parties negotiate with the intent to later memorialize their agreement in a formal writing, Iowa courts look to Restatement (Second) of Contracts § 27 to determine whether the parties' negotiations constitute a binding contract. *Horsfield Const., Inc. v. Dubuque Cty.*, 653 N.W.2d 563, 570–73 (Iowa 2002). Section 27 states:

> Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

RESTATEMENT (SECOND) OF CONTRACTS § 27 (AM. LAW INST. 1981). Section 27's comments discuss whether the parties formed a contract in a given set of circumstances. Comment a discusses parties' intent to form a contract:

> a. Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final

5

writing shall contain these provisions and no others, they have then concluded the contract.

RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. a. Comment b discusses when negotiations are insufficient to form a contract:

> b. On the other hand, if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. b. Comment c describes the relevant factors:

> c. Among the circumstances which may be helpful in determining whether a contract has been concluded are the following: the extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party takes any action in preparation for performance during the negotiations. Such circumstances may be shown by oral testimony or by correspondence or other preliminary or partially complete writings.

RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. c.

Settlement Terms

The only term the parties dispute is the amount of access Plaintiffs will have to the Assets while they are stored in Hennigar's plant (Term #5).[3] Defendants argue that they never agreed to a use term. Defendants assert that the parties only discussed storing the Assets in Hennigar's plant until Plaintiffs' November 23, 2:20 PM email offer, in which Plaintiffs first mentioned the use

---

[3] The parties agree that (1) EnerGenetics will transfer title of and all rights to the Assets to Plaintiffs; (2) Hennigar will release its security interest and all claims in the Assets and transfer any rights it has in the Assets to Plaintiffs; (3) Hennigar will give Plaintiffs a $10,000 non-interest-bearing promissory note, with no payments due for twelve months, at which time the entire balance is due; and (4) Plaintiffs will attempt in good faith to sell the Assets during the promissory note's term; (5) Plaintiffs will be entitled to store the Assets in Hennigar's Fort Madison, Iowa plant for the 12-month duration of the promissory note.

term. Defendants contend they flatly rejected the email offer containing the use term, and then Plaintiffs reverted to the storage term in their next offer. Plaintiffs argue they were discussing a use term at all times after the 2:20 PM email. Plaintiffs contend they believed Defendants' 2:31 PM refusal only referred to the value of the note. Plaintiffs also argue that the settlement agreement's terms are too vague, complex, and unorthodox to constitute a binding agreement without a written contract, and that a mutual mistake of fact prevented the parties from forming a meeting of the minds.

The undersigned finds that the settlement agreement's terms were sufficiently definite to determine the parties' duties and conditions of performance. Viewing the parties' communications objectively, they agreed on the storage term. For the majority of the settlement negotiations, the parties only discussed that Plaintiffs could store the Assets in Defendants' plant. Def.'s Ex. A at 3–12. Plaintiffs' counsel made that clear in his 8:56 AM email, when he said, "Hennigar . . . will agree to *store* the assets, as is, in the current pilot plant space during this two year period and my client will have *access* to them and the plant space *for the purpose of showing them to potential buyers*." Def.'s Ex. A at 9 (emphasis added). Defendants' counsel agreed to the storage term by saying, "The equipment can be *stored* for 6 months *in the plant as is now*. *Access for potential buyers* upon reasonable notice." Def.'s Ex. A at 8 (emphasis added). Plaintiffs' counsel also confirmed his original intent when he said "My client needs 1 year in the plant *as it is now* (it will take some time to sell these things)" in his 1:32 PM email. Def.'s Ex. A at 7 (emphasis added). These statements demonstrate that, before the 2:20 PM email, both parties only discussed storing the Assets in Hennigar's plant while they searched for potential buyers. The only access the parties contemplated was to show potential buyers the Assets.

The first time Plaintiffs' counsel mentioned a use term was in his 2:20 PM email offer, when he said "To be clear, my client said that he'd like to be able to use the property in its current state if he needs to, so I was thinking something like a lease or something for 12 months that would allow my client to do that." Def.'s Ex. A at 3; Hr'g Tr. at 18, 19. Although Plaintiffs' counsel phrased the email in terms of a clarification of his position, this was a change from his previous position that the Assets would only be stored in the plant. The undersigned finds that a reasonable observer looking at the entire conversation would interpret the email as an offer for a use term because it was a completely new term.

In response to Plaintiffs' 2:20 PM email containing this new term, Defendants rejected Plaintiffs' entire offer. Defendants' counsel replied to Plaintiffs' 2:20 PM email, "These terms are just not possible for [Defendants]." Def.'s Ex. A at 2. Defendants' use of the plural phrase "These terms" indicates that this was a refusal of more than one term in Plaintiffs' 2:20 PM email offer. Plaintiffs assert that they believed Defendants rejected only the value of the promissory note because that was what they were primarily discussing. They argue that Defendants' response was vague because they did not manifest specific dissent to the use term. This interpretation is unreasonable. Defendants never agreed to a use term; Plaintiffs assumed Defendants accepted the use term without any manifestation of assent. Defendants did not differentiate between the terms, which is more reasonably interpreted as a complete rejection than a partial one.[4] Taken in the context of the conversation, the undersigned finds that the simple denial without differentiation or explanation was a blanket denial of the entire 2:20 PM offer.

---

[4] Plaintiffs' argument that the parties were primarily negotiating the value of the promissory note, which is why they assumed Defendants' rejection applied only to that term, is undermined by the fact that they were simultaneously negotiating the note's term.

Following this refusal, Plaintiffs offered "My client will agree to the $10,000 note, the assets, the waiver, and the 12 months then." Def.'s Ex. A at 1–2. This offer mirrored Defendants' 2:10 PM offer, which Defendants made before Plaintiffs proposed a use term. Plaintiffs' new offer referred to Defendants' previous offer—which did not include a use term—by repeating the terms and using the word "then."

Unsettled Material Terms

Plaintiffs argue that they did not intend to form an enforceable contract through the email negotiations because the parties still had material terms to negotiate. Specifically, Plaintiffs contend the parties needed to agree on several terms associated with the lease-type agreement that would accompany the use term, such as when and how Plaintiffs could access the Assets. Defendants argue there were no material terms left to negotiate, and Plaintiffs' counsel's actions conflict with their argument that the parties still had material terms left to negotiate.

The undersigned finds that the parties had no material terms left to negotiate. Plaintiffs' counsel's actions undermine their argument that the parties still had material terms left to negotiate. First, the Defendants were willing to settle after discussing only the terms listed in the 2:20 PM email, which were "the $10,000 note, the assets, the waiver, and the 12 months." Def.'s Ex. A at 1. They did not need to discuss any additional terms before agreeing "We have a deal." *Id.* Second, Plaintiffs' counsel drafted the settlement agreement and list of exhibits that would accompany it without further negotiation.[5] Third, Plaintiffs' counsel represented to Defendants and the Court that the parties had "settled," and asked the Court to remove the case from the trial calendar. Def.'s Ex. A at 2. Plaintiffs represented to Defendants and the Court that the parties had settled without

---

[5] The Court also notes that neither Plaintiffs' draft of the agreement nor the list of exhibits that accompany it include or refer to a lease or any other type of use agreement to be signed in the future.

mentioning that the parties still had material terms to negotiate. Almost by definition, the parties had not settled if unsettled material terms remained. Viewing these facts through an objective lens, the parties acted as if there were no material terms left to negotiate.

Plaintiffs' Disclaimer

Plaintiffs argue their counsel's email disclaimer clearly indicated their intent not to form a contract while negotiating. Plaintiffs' counsel's emails each contained a link at the bottom that read "Notice: Important disclaimers and limitations apply to this email. Please click here for our disclaimers and limitations." This link took readers to Plaintiffs' counsel's website, which contained an "Electronic Transaction Disclaimer" that read, in part: "Contract formation in this matter shall occur only with manually-affixed original signatures on original documents unless otherwise specifically agreed in writing." Plaintiffs cite *Schaller Telephone Co. v. Golden Sky Systems, Inc.*, 139 F. Supp. 2d 1071, 1074 (N.D. Iowa 2001), *aff'd*, 298 F.3d 736 (8th Cir. 2002), which held that disclaimers in the parties' negotiation communications prevented them from forming a contract before the agreement was reduced to its final written form. Defendants argue Plaintiffs' counsel's email disclaimer was not conspicuous, and that *Schaller* is factually distinguishable from this case.

The undersigned finds that, on these facts, Plaintiffs' disclaimer did not provide Defendants with a reason to know that Plaintiffs regarded the settlement agreement as incomplete. First, *Schaller* is distinguishable because it involved a situation where the parties "could not be clearer" they did not intend to form a contract from their communications. *Schaller Tel. Co.*, 139 F. Supp. 2d at 1085. It involved parties who specifically communicated that their negotiations were not binding, and those disclaimers were on the face of the offers and negotiation documents. *Schaller*

*Tel. Co.*, 139 F. Supp. 2d at 1085. Here, Plaintiffs' disclaimer falls well below the level of clarity present in *Schaller*. Plaintiffs' counsel never mentioned the disclaimer, and it was not in their emails; it was on their website, which the reader had to access through the link at the bottom of the email.

Plaintiffs' counsel's actions following their agreement also contradict the disclaimer's message. On November 23, 2016 at 2:44 PM, Plaintiffs' counsel said, "We have a deal." He never informed Defendants of the disclaimer's presence or the possibility that they had not entered into an enforceable contract. Hr'g Tr. at 20, 21. Plaintiffs' counsel offered to "draft a letter to the court and let them know that we've settled and to take the hearing off the calendar," which he did that day. Def.'s Ex. A at 1–2; Def.'s Ex. B. Plaintiffs' counsel's conduct affirmatively indicated to Defendants that the parties had entered into an enforceable contract. Plaintiffs' counsel's disclaimer, when refuted by their actions, was insufficient to give a reasonable observer grounds to believe that Plaintiffs had not entered into an enforceable agreement through their email negotiations.[6]

In addition to the parties' objective agreement to definite terms, the § 27 factors support finding an enforceable settlement agreement. The parties agreed on all material terms. The contract does not contain many details, nor is it complex. The negotiations involved five or six material terms, which hardly take up a page of the proposed formal settlement agreement. The entire proposed settlement agreement is six pages, plus exhibits. On the other hand, the agreement is the type parties would usually put in writing, it is unusual, and it does not involve a standard-form

---

[6] The undersigned is not suggesting that a disclaimer that is only accessible through a link in an email is *per se* ineffective. The undersigned is simply finding that, based on the evidence before her, a reasonable observer would have interpreted Plaintiffs' counsel's actions as a manifestation of assent to enter into a contract, notwithstanding Plaintiffs' counsel's email disclaimer.

11

contract. As a whole, the undersigned finds that the simplicity of the agreement tips the § 27 factors in favor of finding an enforceable contract on these facts.

Mistake

Plaintiffs argue that a mutual, material mistake of fact prevented the parties from forming a contract because they did not agree on the material terms. Plaintiffs argue they thought they were agreeing to a use term, while Defendants thought they were agreeing to a storage term. Plaintiffs assert that the vague language in the email correspondence prevented the parties from coming to a meeting of the minds. They ask that the Court either reform the agreement to include a use term, or find that the parties had not agreed. Defendants argue that Plaintiffs failed to meet their burden of showing that the terms of the written agreement do not conform to their actual agreement by "clear, satisfactory, and convincing" evidence. Defendants also argue that, when looking at the conversation as a whole, it is clear the parties had agreed on only a storage term. Finally, Defendants argue that if there was a mistake, it was unilateral, not mutual.

"A mistake is a belief that is not in accord with the facts." *Nichols v. City of Evansdale*, 687 N.W.2d 562, 570 (Iowa 2004) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 151). There are three types of mistakes involving contracts: mistakes in formation, integration, or performance. *Pathology Consultants v. Gratton*, 343 N.W.2d 428, 437 (Iowa 1984). Plaintiffs allege a mistake in formation because it involves "an underlying assumption concerning matters relevant to the decision to enter into a contract."[7] *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 151

---

[7] "Mistakes in the formation of contracts include mistakes in an underlying assumption concerning matters relevant to the decision to enter into a contract. In this category of mistake, the agreement was reached and expressed correctly, yet based on a false assumption." *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 151 (Iowa 2001) (citations omitted). Here, Plaintiffs contend that the parties believed they agreed, but assumed they had come to an agreement on the use term when they had not.

(Iowa 2001). The remedy for such a mistake is rescission. *See Nichols*, 687 N.W.2d at 571. In order to rescind a contract, the mistake must be mutual. *Krieger v. Iowa Dep't of Human Servs.*, 439 N.W.2d 200, 203 (Iowa 1989). "To be mutual, a mistake must exist at the time of the contract and must be common to both parties." *Id.* "[B]oth [parties] must have labored under the same misconception in respect of the terms and conditions of a written instrument." *Schuknecht v. W. Mut. Ins. Co.*, 203 N.W.2d 605, 609 (Iowa 1973) (citing 76 C.J.S. *Reformation of Instruments* § 28).

The undersigned finds that there was no mutual mistake of material fact that prevented the parties from entering into an enforceable contract because the mistake Plaintiffs allege was not mutual. Plaintiffs argue that the parties disagreed on the terms of the settlement. According to Plaintiffs, they are not laboring under the same misconception as to the terms of the agreement; they are laboring under different ones. The fact that both parties made mistakes, or that one party made a mistake that the other was not aware of, does not make the mistake mutual. *Cf. Krieger*, 439 N.W.2d at 203. Any mistake here is not mutual. *See Gouge v. McNamara*, 586 N.W.2d 710, 713 (Iowa Ct. App. 1998) (requiring the parties to believe the same mistaken fact in order to find a mutual mistake).

Even if the mistake were mutual, the undersigned finds that Plaintiffs are not entitled to a rescission of the contract because they bore the risk of loss. "A party bears the risk of a mistake when . . . the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so." *C & J Leasing Corp. v. Island Sun Enters., Inc.*, 698 N.W.2d 337 (Iowa Ct. App. 2005) (quoting RESTATEMENT (SECOND) CONTRACTS § 154). It is reasonable to find that Plaintiffs bore the risk of loss because their assumption that the parties had agreed to a use term was unreasonable. The parties had never contemplated a use term until Plaintiffs offered one in its

2:20 PM email, to which Defendants responded with a flat denial. Plaintiffs' assumption that the denial of "[t]hese terms" only applied to the amount of the note—and not the note's length or the use term that the email also offered—is not objectively reasonable. *See* Hr'g Tr. at 14–15. It is an even greater stretch for Plaintiffs' counsel to believe that Defendants' alleged silence on the use term operated as an acceptance.[8] The undersigned finds that Plaintiffs have failed to prove that there was a mutual mistake of a material fact because the mistake was not mutual, and because Plaintiffs bore the risk of loss for their unreasonable assumption.

The undersigned finds that the parties mutually intended to be bound by the terms of their email negotiations. The parties' email exchange resulted in clear contractual terms that this Court can enforce. The parties agreed that (1) EnerGenetics will transfer title of and all rights to the Assets to Plaintiffs; (2) Hennigar will release its security interest and all claims in the Assets and transfer any rights it has in the Assets to Plaintiffs; (3) Hennigar will give Plaintiffs a $10,000 non-interest-bearing promissory note, with no payments due for twelve months, at which time the entire balance is due; (4) Plaintiffs will attempt in good faith to sell the assets during the promissory note's term; and (5) Plaintiffs will be entitled to store the Assets in Hennigar's Fort Madison, Iowa plant for the 12-month duration of the promissory note. Plaintiffs may access the Assets to show them to potential buyers or prove that the Assets work, but may not access them for any other reason. Plaintiffs must remove the Assets from Hennigar's Fort Madison, Iowa plant at the end of the 12-month promissory note. The parties had no additional material terms left to negotiate. Plaintiffs' disclaimer did not prevent the formation of the contract based on its location and Plaintiffs' counsel's conduct following their agreement. Finally, there was no mutual mistake of fact to prevent the parties from understanding the terms of the agreement.

---

[8] The undersigned recognizes that this general rule has some exceptions. *See Rucker v. Taylor*, 828 N.W.2d 595, 602 (Iowa 2013) (citing RESTATEMENT (SECOND) OF CONTRACTS § 69). Those exceptions do not apply here.

**Mutual Assent**

The parties mutually assented to enter into this contract. Parties mutually assent to enter into a contract through offer and acceptance. *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 268 (Iowa 2001). An offer "induces a reasonable belief in the recipient that he can, by accepting, bind the sender." *Rucker v. Taylor*, 828 N.W.2d 595, 602 (Iowa 2013) (internal quotations omitted). An acceptance is "a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." *Heartland Express*, 631 N.W.2d at 270 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 50)). "An offeree's power of acceptance is terminated by his rejection of the offer, unless the offeror has manifested a contrary intention." RESTATEMENT (SECOND) OF CONTRACTS § 38. "A conditional acceptance, that is, one which expresses a willingness to enter into a contract on terms which differ from the offer, is a rejection of the offer and constitutes a counteroffer which invites acceptance of the modification." *John T. Jones Constr. Co. v. Hoot Gen. Const.*, 543 F. Supp. 2d 982, 1017 (S.D. Iowa 2008) (citing *Rick v. Sprague*, 706 N.W.2d 717, 724 (Iowa 2005) and RESTATEMENT (SECOND) OF CONTRACTS § 59). Whether the parties mutually assented to be bound by the contract is a question of fact determined using an objective standard. *Rucker*, 828 N.W.2d at 602.

The undersigned finds that the parties mutually assented to enter into the contract. As noted above, each party's changed offer constituted a rejection of the other party's previous offer, as well as a counteroffer. Plaintiffs' counsel's November 23, 2:20 PM email offering a $25,000, 12-month note plus a use term was a new offer that rejected Defendants' previous offer. Defendants' counsel's 2:31 PM email, which read, "These terms are just not possible for [Defendants]," was a rejection of Plaintiffs' most recent offer; it terminated Defendants' ability to accept Plaintiffs' offer. Def.'s Ex. A at 2.

Following Defendants' counsel's 2:31 PM rejection email, neither party had an outstanding offer that the other party was able to accept. Plaintiffs' counsel sent a new offer in its 2:44 PM email, which read, "My client will agree to the $10,000 note, the assets, the waiver, and the 12 months then. We have a deal." Def.'s Ex. A at 1. Despite the language of acceptance that Plaintiffs' counsel used in the 2:44 PM email, there was no offer to accept; this email was an offer. It was reasonable for Defendants to believe they could accept this offer by manifesting assent. Defendants' counsel's 2:45 PM—"Yes agreed"—accepted Plaintiffs' offer because it is a manifestation of assent to that offer. Def.'s Ex. A at 1. The parties mutually assented to enter into the contract.

The undersigned recommends that the Court grant Defendants' Motion to Enforce Settlement because, based on the objective evidence, the parties mutually intended to be bound by the terms of the contract, and mutually assented to enter into it. The parties' negotiations culminated in an agreement that allowed Plaintiffs to store the Assets in Hennigar's plant, but not to operate the Assets to produce a profit. The parties had agreed on all of the material terms. Plaintiffs' counsel's website disclaimer was insufficient to provide notice to Defendants that the parties had not settled in light of Plaintiffs' counsel's actions. Plaintiffs directly represented to Defendants and the Court that the parties had settled, and acted consistently with that representation. Finally, there was no mutual mistake of a material fact in these negotiations because Defendants' mistake was unilateral and unreasonable. The undersigned recommends the Court grant Defendants' Motion to Enforce Settlement.

### Attorney's Fees

Defendants argue that they are entitled to an award of attorney's fees. They contend Plaintiffs acted in bad faith when they represented to Defendants and the Court that the parties had

reached an agreement, but then later claimed to have never entered it. They assert "[Plaintiffs] changed their minds in an attempt to re-negotiate the deal." Def.'s Mot. to Enforce Settlement at 19, ECF No. [79-1]. Plaintiffs argue Defendants knew of Plaintiffs' tenuous financial position, and knew their refusal to comply with this settlement agreement would further stress Plaintiffs. Plaintiffs argue that Defendants are not entitled to attorney's fees because Plaintiffs are resisting this settlement in good faith.

"It is well within the district court's broad discretion in reviewing a request for fees to consider not only the amount of the fees, but also the party's unprofessional conduct in the case." *Wescott Agri-Prods., Inc. v. Sterling State Bank, Inc.*, 682 F.3d 1091, 1095 (8th Cir. 2012) (citing *Jaquette v. Black Hawk Cty.*, 710 F.2d 455, 459, 461 (8th Cir.1983)). However, courts begin their analysis from the "basic point of reference" that each party pays for its own attorney's fees. *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–53 (2010).

The undersigned recommends that the Court deny Defendants' request for attorney's fees in this case. As discussed above, Plaintiffs' interpretation of the settlement negotiations is inconsistent with the plain text of the parties' email communications. However, this interpretation is not so far off base as to encourage the Court to diverge from the traditional American rule and impose a penalty. Plaintiffs' arguments, while not ultimately persuasive, had some merit. In addition, both parties could have better summarized and clarified the terms of the settlement before ending their discussions and considering the matter resolved. Without any evidence of bad faith or some other encouragement to penalize Plaintiffs, I recommend the Court deny Defendants' request for attorney's fees.

# REPORT AND RECOMMENDATION AND ORDER

After a thorough review of the entire record, the undersigned respectfully recommends that the Court **grant** Defendants' Motion to Enforce Settlement, ECF No. [79], and enter an order of specific performance as follows. The parties shall enter into a formal settlement agreement memorializing these terms:

1. EnerGenetics will transfer title of and all rights to the Assets to Plaintiffs;

2. Hennigar will release its security interest and all claims in the Assets and transfer any rights it has in the Assets to Plaintiffs;

3. Hennigar will give Plaintiffs a $10,000 non-interest-bearing promissory note, with no payments due for twelve months, at which time the entire balance is due;

4. Plaintiffs will attempt in good faith to sell the Assets during the promissory note's term;

5. Plaintiffs will be entitled to store the Assets in Hennigar's Fort Madison, Iowa plant for the 12-month duration of the promissory note. Plaintiffs may access the Assets to show them to potential buyers or prove that the Assets work, but may not access them for any other purpose. Plaintiffs must remove the Assets from Hennigar's Fort Madison, Iowa plant at the end of the promissory note's 12-month term.

The undersigned also respectfully recommends that the Court **deny** Defendants' request for an award of attorney's fees.

IT IS ORDERED that the parties have until **May 11, 2017** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation

and relevant portions of the record to which the objections are made and must set forth the basis for such objections. See FED. R. CIV. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

IT IS SO ORDERED.

Dated this 27th day of April, 2017.

_____
Helen C. Adams
Chief U.S. Magistrate Judge